Frederick S. WYLE, Trustee in Bankruptcy of Pacific Far East Line, Inc. and Atlantic Bear Steamship Co., Plaintiff,

v.

BANK MELLI OF TEHRAN, IRAN; Ports & Shipping Organization of Bushire, Iran; Islamic Republic of Iran; and Bank of California, Defendants.

No. C–80–1131 RFP.

United States District Court, N.D. California.

Sept. 15, 1983.

Cynthia M. Cohen, Stutman, Triester & Glatt, P.C., Los Angeles, Cal., for plaintiff.

Michael Connell, San Francisco, Cal., John E. Carne, Crosby, Heafey, Roach & May, Oakland, Cal., Daniel P. Levitt, Greg A. Danilow, Arthur H. Aufses, Kramer, Levin, Nessen, Kamin & Soll, New York City, for defendants.

*Memorandum Opinion*

PECKHAM, Chief Judge.

The above-entitled action was tried to the court. Having considered the evidence and the authorities provided by the parties, the court now enters its findings of fact and conclusions of law in the form of this memorandum opinion.

## I. FACTS

During and after 1976, continuing until the second quarter of 1978, Pacific Far East Line, Inc. ("PFEL") and its subsidiary, Atlantic Bear Steamship Co. ("Atlantic")[1] engaged in shipping operations into the Port of Bushire, Iran. As a condition of carrying on these operations, the Ports and Shipping Organization of Bushire, Iran ("PSO") required that PFEL maintain a bond in Iran to cover claims for lost or damaged cargo. Prior to the fall of 1976, PFEL had employed as its agent in Iran a company named Seaman Pac. Seaman Pac maintained its own bond in the amount of $100,000, which covered PFEL for claims against lost or damaged cargo.

In the fall of 1976, PFEL decided to change agents. At PFEL's instigation, a new company named PFEL-Iran was formed to act as PFEL's agent in Iran. PFEL-Iran was a completely separate entity neither owned nor controlled by PFEL. In the course of changing agents, a new indemnity arrangement was established, and is now the subject matter of this litigation. The new arrangement involved "back-to-back" guarantees.

PSO wanted a guarantee from an Iranian bank, Bank Melli. PFEL arranged a letter of credit from its bank, Bank of California in San Francisco, to indemnify Bank Melli in the event that PSO should call on Bank Melli's guarantee. To secure Bank of California, PFEL placed funds with the bank in a certificate of deposit. PFEL's initial letter of credit application, dated September 29, 1976 (Px 2), for Bank of California letter of credit number 55851, was for a performance bond in the amount of $200,000 and set forth conditions for payment on the letter of credit which included documentation of claims for missing or damaged cargoes caused by negligence of PFEL. When issued on October 12, 1976, letter of credit 55851 (Px 3) embodied the documentation condition requested by PFEL.

The documentation requirement proved unacceptable to PSO. PSO required that Bank Melli's guarantee be payable against a "simple demand," and also that the original expiration date of the guarantee—October 15, 1977—be extendable at the request of PSO. Bank Melli, in turn, required that letter of credit 55851 be amended in the same manner—by deleting the documentation requirement and making extensions available upon request—before it would issue to PSO, its guarantee which would enable PFEL to continue doing business in Iran. Although James Hitt, who at the

---

1. PFEL and Atlantic filed under Chapter XI of the Bankruptcy Act in January and February of 1978 respectively. PFEL was adjudicated a bankrupt on August 4, 1978. This action is brought by the duly appointed, qualified and acting Trustee in Bankruptcy of PFEL and Atlantic.

time of these events was PFEL's Vice-President responsible for making these arrangements, testified that eliminating the documentation requirement made him uncomfortable, he bowed to the demand so that PFEL might continue carrying cargoes to Iran.

■ The intended scope of the guarantee arrangement was a contested issue in this litigation. The correspondence over the amendment does not show that PSO intended, much less that PFEL agreed, to enlarge the scope of coverage beyond cargo claims. There was unrebutted testimony that this guarantee replaced a prior bond for damaged cargo. The most reasonable inference on this record is that the deletion of the documentation requirement was not intended to and did not broaden the scope of coverage, and the court so finds.

On January 9, 1977, PSO and PFEL-Iran entered into an agreement (Dx 2), which created numerous obligations and potential liabilities for PFEL-Iran. Defendants [2] argued that Article 5 of this agreement incorporated the PFEL-Bank of California-Bank Melli-PSO indemnity arrangement. Thus, defendants claim, Article 5 either made letter of credit 55851 liable for PFEL-Iran's obligations or stated the prior understanding of the parties to that effect. The defendants' claim finds some support in the fact that the amount of the "Well Performance Guarantee" specified by Article 5—25,000,000 rials—at then current exchange rates was equivalent to $357,000, and the amount available under letter of credit 55851 had been increased on November 23, 1976 to $355,000. The closeness of these two figures suggests that there could have been some link between the two guarantees.

On the other hand, PFEL is not a party to the January 9 agreement. The agreement makes specific reference to PFEL only once, in Article 3, section 9, which limits PFEL-Iran to unloading shipments of PFEL, "which *has accepted* the short landing and all the compensations in all stages

up to the time of delivering goods to owners, and undertakes to maintain & load them in suitable manner & conditions. [sic]" (emphasis added). The section does allow PFEL-Iran with PSO's consent to unload shipments from other shipping lines "which similar to the above Line accepts all kinds of responsibilities in this respect." This specific reference to PFEL's guarantee and its specific purpose in another part of the agreement tends to rebut the inference that PFEL's guarantee is also the Article 5 guarantee covering all of PFEL-Iran's obligations.

Moreover, PFEL-Iran sent a telex (Px 7) to PFEL reporting that the agreement had been signed, and saying, *inter alia,* "PFEL Iran Ltd is your agents in Iran and also the responsibility of loss or damage to the cargoes unloaded from your vessels at the Bushire facilities of PFEL Iran will be yours till the time of delivery to the consignees." Notably, the statement of PFEL's responsibilities did not—contrary to defendants' suggestion—include PFEL-Iran's tax or wage liabilities. It is fully consistent with Mr. Hitt's testimony regarding what he understood to be the scope of PFEL's liability. The Certificate issued by PFEL in response to this telex on January 11, 1977, reflects the same scope of liability.

■ Finally, the coincidence of the amount of the two guarantees is reduced to insignificance when both are stated in rials—about 25,000,000—as opposed to dollars. In rials, the figure is a round amount that could well have been a standard requirement for entities doing business with PSO, which included in this case both PFEL and PFEL-Iran. The court finds that the January 9, 1977 agreement did not enlarge the scope of PFEL's liability on its indemnity arrangement incorporating letter of credit 55851 nor did it reflect any prior agreement to enlarge the scope of liability beyond responsibility for lost or damaged cargo.

---

2. Defendant Bank of California has taken a neutral position in this litigation; thus, "defend- ants" here refers to the three Iranian defendants.

PFEL ceased doing any business in Iran in the second quarter of 1978. PFEL and Atlantic had filed for bankruptcy in early 1978. The indemnity arrangement was still in effect at that time, letter of credit 55851 having been extended from time to time. During the period of PFEL's active operations to Iran, only one claim was made against the guarantee in the approximate amount of $15,000. Mr. Hitt investigated this claim and received documents through PFEL-Iran that satisfied him that the claim did in fact involve damaged cargo. He wrote a check to Bank of California, which had paid on Bank Melli's demand, to bring the amount of the letter of credit back up to $355,000.

In February, 1978, Bank Melli requested an additional extension of letter of credit 55851 through April 20, 1979, or, in the alternative as provided by the terms of the letter, payment of the amount guaranteed. (Px 15–17). This extension was given. After the cessation of operations, Hitt attempted to have the guarantee and letter of credit terminated, and accordingly tried to arrange for public notice to be published in an Iranian newspaper so that any outstanding claims could be closed, but there is no evidence as to whether this plan was actually executed in Iran.

A claim for $12,396.25 (Px 19) was apparently transmitted on October 5, 1978 and paid shortly thereafter, since subsequent extensions of the letter of credit refer.to the amount outstanding as $342,612.35 (the small discrepancy in these figures, which add up to $355,008.60, is unexplained). Further extensions on the letter of credit were requested and given in March, 1979, to run through September 22, 1979; in September, 1979, to run through April 19, 1980; and in March, 1980, to run through October 22, 1980.

When the March, 1979 request for extension was made, Mr. William Miles, a Vice-President in the International Division of Bank of California, sent a message to Levon Djanece, the Chief Agent of the New York office of Bank Melli, and also a director of the Bank. The communication stated that PFEL had operated no vessels to Bushire for more than a year and had no plans to resume service there. Miles asked Djanece, whom he knew personally, to make inquiries into PSO's continuing need for the guarantee arrangement. In a subsequent telephone call, Djanece told Miles that he had put the question "To Tehran to the right people" and that Miles would be hearing from them directly. Nothing further was heard, however.

On March 26, 1980, Bank Melli made demand on Bank of California for payment of the full amount available under letter of credit 55851, stating that PSO had claimed Bank Melli's guarantee amount "for non fulfilment all agreed obligations [sic]" (Px 24). This litigation ensued immediately, and payment on letter of credit 55851 has been enjoined during the pendency of the action. Plaintiff's essential factual contentions are that no actual, bona fide claims for missing or damaged cargo underlie this demand, and that the three Iranian co-defendants conspired to make a fraudulent demand on letter of credit 55851 and cause the trustee to be deprived of the funds on deposit as collateral with Bank of California.

This factual record is remarkable for its paucity. In the main, this is the responsibility of PSO, which refused to comply with plaintiff's reasonable discovery requests. As a sanction for failure to comply with the discovery rules and this court's prior orders, the court entered a preclusion order on February 8, 1982, which, *inter alia*, establishes plaintiff's factual contentions as against PSO. This order does not obviate the need for proof of these contentions as against the remaining defendants, however.

The court finds that on this record the most reasonable inference that can be drawn is that plaintiff is essentially correct in maintaining that there are no bona fide claims to support the demand, or at least, none of the magnitude represented by the entire amount of letter of credit 55851. This inference is based on the relatively insignificant amount of claims during

PFEL's active operations, the very long time lag between the cessation of PFEL's operations in Iran and the demand for full payment, and the failure of defendants to bring forth *any* evidence of actual claims supporting the demand during the almost two and a half years of this litigation.

Letter of credit 55851 was effective during approximately a year and a half of PFEL operations into Bushire. One claim of $15,000 arose and was paid during this time and apparently another approximately $12,000 claim was paid after the cessation of operations. The court finds it inherently incredible that some *two years* after the complete cessation of operations, PSO would suddenly uncover over $340,000 of unpaid cargo claims.

■ Defendants have argued that because the guarantees were payable "on simple demand," they were relieved of any obligation to prove the underlying claims. It is certainly true as a matter of technical-legal construction of the agreement that defendants did not have to prove claims. Once plaintiff had made a sufficient factual showing, however, to persuade this court to preliminarily enjoin payment, it was clear that the "simple demand" term would not serve its intended purpose of simplifying and expediting a claim under the guarantee. One would logically expect defendants to come forward at some point to seek dissolution of the injunction, or at a minimum, to rebut plaintiff's case at trial, with some sort of showing that the claims had a basis in fact. The court is free to draw the inference that since it would have been in defendants' interest to bring such evidence forward, their failure to do so makes it less likely that such evidence exists.

■ Characterizing the roles of Bank Melli and Iran itself in the plan to make false claims presents a more difficult issue. Plaintiff asks us to find an actual conspiracy as well as to impute knowledge and responsibility based on the legal relationships among the entities involved. The latter question will be taken up subsequently. As to the existence of a conspiracy-in-fact, plaintiff relies essentially on evidence which he contends establishes a systematic program by the Islamic Republic of Iran to obtain the funds available under a large number of standby letter of credit arrangements entered into between U.S. companies and various Iranian entities prior to the Islamic Revolution in Iran.

Plaintiff asked the court to take judicial notice of the large number of legal proceedings in various courts around the country. We believe such a request exceeds the proper bounds of judicial notice. There is one item which we can notice, however, because it has become part of the record in this action, and that is the claim submitted on behalf of Bank Melli and against Bank of California to the Iran-United States Claims Tribunal at the Hague, a claim on letter of credit 55851. This remarkable document is, as plaintiff characterized it, a form, fill-in-the-blanks, in which the operative language concerning failure to pay on demand on a letter of credit has clearly been typed by a different typewriter than the language which identifies the particular respondent bank and letter of credit.

This is some evidence of a substantial nature to support plaintiff's claims concerning an Iranian policy of demanding payment on letters of credit without regard to whether payment is justified on the facts underlying the guarantee arrangements. Nevertheless, the court is unwilling to make a factual finding of the existence of a conspiracy in this case solely from the claim to the Hague, and there is nothing else in the record that would permit the court to do so.

■ The court does find, however, from both the letter and testimony of Mr. Miles, that Bank Melli had actual knowledge of the time that had elapsed since PFEL had ceased operations in Iran and that no claims had been presented during that time. From this, the court further infers that Bank Melli knew or, in the exercise of reasonable prudence, should have known that PSO's demand on the Bank Melli guarantee was made in bad faith, without a basis in actual claims, to obtain the funds

available under the guarantee mechanism for its own purposes. Moreover, as both PSO and Bank Melli understood the operation of the back-to-back guarantee arrangement, it was PSO's intent, of which Bank Melli knew or should have known, that the ultimate source of the funds thus obtained would be PFEL or its successor.

## II. LEGAL DISCUSSION

### A. Jurisdiction

Jurisdiction as to defendant Bank of California is not disputed. It is also undisputed that defendants Bank Melli and PSO are "agenc[ies] or instrumentalit[ies] of a foreign state" as defined by 28 U.S.C. § 1603(b). Therefore, both subject matter and personal jurisdiction as to all three Iranian defendants must be determined under the Foreign Sovereign Immunities Act of 1976 ("FSIA"). The relationship between personal jurisdiction under the FSIA and the due process "minimum contacts" analysis is somewhat murky, but this court agrees with the analysis in *Texas Trading & Milling Corp. v. Federal Republic of Nigeria,* 647 F.2d 300 (2d Cir.1981), *cert. denied,* 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982) (*"Texas Trading "*) and will analyze the two questions sequentially —first, the statutory issue, then the due process issue.[3]

### 1. Jurisdiction under the FSIA.

The *Texas Trading* court described the FSIA as

3. A Ninth Circuit case decided prior to *Texas Trading* seemed to construe the relationship between the FSIA and the due process inquiry somewhat differently. *Thos. P. Gonzalez Corp. v. Consejo Nacional de Produccion de Costa Rica,* 614 F.2d 1247 (1980). The court rejected an argument that the FSIA had redefined the minimum contacts standard as applied to foreign states, stating that the "direct effect" clause of § 1605(a)(2) embodies the traditional minimum contacts standard of the *International Shoe* line of cases. *Id.* at 1255.

The same result is reached in the end concerning the constitutional limits on personal jurisdiction under either the *Texas Trading* or *Gonzalez* analyses, but the *Texas Trading* analysis is helpful because it separates the question of

a marvel of compression. Within the bounds of a few tersely-worded sections, it purports to provide answers to three crucial questions in a suit against a foreign state: the availability of sovereign immunity as a defense, the presence of subject matter jurisdiction over the claim, and the propriety of personal jurisdiction over the defendant.

*Id.* at 306.

28 U.S.C. § 1330(a) gives the district courts

original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605– 1607 of this title or under any applicable international agreement.

In the present action, the relevant exception to sovereign immunity is contained in section 1605(a)(2), which provides as follows:

(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—

.· ⁕ : ⁕ ⁕ ⁕

(2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere

whether Congress would have wanted jurisdiction to be exercised in a particular case, assuming such exercise to be constitutional, from the question of whether in fact the exercise of such jurisdiction is consistent with "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). Because the comments about the FSIA in *Gonzalez* preceded the much fuller analysis of *Texas Trading,* and because the *Gonzalez* holding really went only to the question of whether the FSIA relaxed the constitutional standard of minimum contacts, a point on which there is no conflict between the two opinions, we apply the analytical framework set out in *Texas Trading.*

and that act causes a direct effect in the United States.

"Commercial activity" is defined in section 1603(d):

A "commercial activity" means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

Under the FSIA, "Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under section 1608 of this title." 28 U.S.C. § 1330(b). As stated in *Texas Trading,*

The Act, therefore, makes the statutory aspect of personal jurisdiction simple: subject matter jurisdiction plus service of process equals personal jurisdiction. But, the Act cannot create personal jurisdiction where the Constitution forbids it. Accordingly, each finding of personal jurisdiction under the FSIA requires, in addition, a due process scrutiny of the court's power to exercise its authority over a particular defendant.

*Texas Trading, supra,* 647 F.2d at 308. The court then summarized the analysis of jurisdiction in "a § 1605(a)(2) case" in a series of five questions:

1) Does the conduct the action is based upon or related to qualify as "commercial activity"?

2) Does that commercial activity bear the relation to the cause of action and to the United States described by one of the three phrases of § 1605(a)(2), warranting the Court's exercise of subject matter jurisdiction under § 1330(a)?

3) Does the exercise of this congressional subject matter jurisdiction lie within the permissible limits of the "judicial power" set forth in Article III?

4) Do subject matter jurisdiction under § 1330(a) and service under § 1608 exist, thereby making personal jurisdiction proper under § 1330(b)?

5) Does the exercise of personal jurisdiction under § 1330(b) comply with the due process clause, thus making personal jurisdiction proper?

*Id.*

There is here no real dispute as to three of the five questions posed by *Texas Trading.* It is undoubted that the acts of Bank Melli and PSO were "commercial activity." The action is clearly one that article III allows Congress to include in a statutory grant of jurisdiction; it is an action "Between a State, or the Citizens thereof, and [a] foreign state ...." Finally, if the case were found to fall within one or more of the section 1605(a)(2) exceptions to immunity, then subject matter jurisdiction would exist under section 1330(a) and, since service was effected by order of the court, in accordance with section 1608(a)(3) or (4), personal jurisdiction would exist under section 1330(b). The contested issues are "does the commercial activity bear the relation to the cause of action and to the United States described by one of the three phrases of § 1605(a)(2)," and "does the exercise of personal jurisdiction under § 1330(b) comply with the due process clause?"

■ Before proceeding with the 1605(a)(2) analysis, plaintiff makes two other contentions which, if sustained, would render that analysis unnecessary. Section 1330(a) grants jurisdiction over any claim with respect to which the foreign state is not entitled to immunity "under any applicable international agreement." The plaintiff argues that defendants have waived immunity by the Treaty of Amity, Economic Relations, and Consular Rights between the United States of America and Iran, August 15, 1955 [1957], 8 U.S.T. 899, TIAS No. 3853 ("Treaty of Amity").[1]

---

**4.** The Treaty of Amity provides in pertinent part: "No enterprise of either High Contracting Party, including corporations, associations, and government agencies and instrumentalities, which is publicly owned or controlled, shall, if it engages in commercial, industrial, shipping or other business activities within the territory of the other High Contracting Party, claim or en-

Bank Melli asserts that the waiver of immunity by this treaty is transactional, requiring a nexus between the particular commercial activity sued upon and the United States. Assuming, *arguendo,* that such a nexus is absent here (an issue to which we return in the 1605(a)(2) analysis), the only case cited by defendant for this interpretation of the treaty, *Chicago Bridge & Iron Co. v. Islamic Republic of Iran,* 506 F.Supp. 981 (N.D.Ill.1980), does not so interpret it. In terms, the waiver essentially places an Iranian entity doing business in the U.S. on the same footing as an American corporation. Since Bank Melli operates agencies in San Francisco and New York, it would appear that it has indeed waived immunity by this treaty. However, as defendant points out, relying again, and correctly this time, on *Chicago Bridge,* a waiver of sovereign immunity by Treaty does not include a waiver of the minimum contacts due process requirement. That analysis is still required. Also, the treaty waiver cannot apply to PSO, since the latter does not carry on commercial activity within the United States, nor does it apply to Iran itself.

Plaintiff also argues that since the legislative history of the FSIA states explicitly that sovereign immunity is an affirmative defense, *see* H.R.Rep. No. 94–1487, 94th Cong., 2d Sess. 13, 17, *reprinted in* [1976] U.S.Code Cong. & Ad.News 6604, 6616, and since defendants here introduced no evidence in support of their claim of immunity, plaintiff therefore "carries the day and jurisdiction will be found to exist." Plaintiff's Post-Trial Memorandum at 22–23. This argument is specious. The legislative history makes clear what the foreign state must prove to establish *immunity:* that the challenged action is that of a foreign state in its *public,* noncommercial capacity. The burden of proving the existence of an otherwise actionable (if not barred by sovereign immunity) activity or act within the United States or having a

direct effect in the United States would obviously remain with the plaintiff. Simply because the foreign state must plead and prove certain of the facts necessary to establish its immunity does not mean that the normal burden of proving subject matter and personal jurisdiction is reversed.

Proceeding with the analysis under section 1605(a)(2), plaintiff relies primarily on the "direct effect" clause, arguing that the demand by Bank Melli on the letter of credit, if honored, would cause a depletion of funds from Bank of California, which in turn would call on its collateral, the Atlantic Bear CD, thereby depriving the bankruptcy estate of its property.

Whether a loss of this sort, essentially a financial loss, was envisioned by Congress as the type of "direct effect in the United States" sufficient to create an exception to sovereign immunity and to vest the court with subject matter jurisdiction is not entirely free from doubt, but the better view holds that Congress did intend jurisdiction to be exercised in a case such as this. *See Texas Trading, supra,* 647 F.2d at 311–13. *See generally Note, Effects Jurisdiction Under the Foreign Sovereign Immunities Act and the Due Process Clause,* 55 N.Y. U.L.Rev. 474 (1980). *Texas Trading* involved the breach of contracts by the Nigerian government for the purchase of cement. The court analyzed separately the two parts of the critical phrase, "direct" and "in the United States," as they applied in that case.

Two cases illustrated "directness" as it applies to an individual: In *Harris v. VAO Intourist Moscow,* 481 F.Supp. 1056 (E.D. N.Y.1979), a man lost his life in a hotel fire. In *Upton v. Empire of Iran,* 459 F.Supp. 264 (D.D.C.1978), *aff'd mem.,* 607 F.2d 494 (D.C.Cir.1979), the roof of a building fell in on someone. The *Texas Trading* court then considered the application of "direct" to a corporation:

> Applying the term to a corporation is not so simple. Unlike a natural person, a

joy, either for itself or for its property, immunity therein from taxation, suit, execution of judgment or other liability to which privately owned and controlled enterprises are subject therein." 8 U.S.T. at 909.

corporate entity is intangible; it cannot be burned or crushed. It can only suffer financial loss. Accordingly, the relevant inquiry under the direct effect clause when the plaintiff is a corporation is whether the corporation has suffered a "direct" financial loss. To discover whether breach of contract causes this type of loss, we look to *Carey v. National Oil Corp.*, 592 F.2d 673, 676–77 (2d Cir.1979) (*per curiam*). In *Carey,* we decided that a direct effect can arise not only from a tort, *e.g., Harris* and *Upton, supra,* but from cancellation of a contract for the sale of oil as well. Here, under either theory of recovery, breach of cement contracts or breach of the letters of credit, the effect of [sic] the suppliers was "direct." They were beneficiaries of the contracts that were breached.

647 F.2d at 312.

The court then analyzed "in the United States." It noted that state law cases locating "effects" for personal jurisdiction purposes are plentiful, but said, "those cases are not precisely on point, for they are concerned more with federalism, and less with international relations than was Congress in passing the FSIA." *Id.* The court found that the loss occurred in the United States for two reasons: First, because the cement suppliers were to present documents and receive payment in the U.S. and the breach prevented them from doing so, and second, because the plaintiffs were American corporations.

■ In the present case, the effect is clearly located in the United States. If the demand is honored, assets will be removed from the United States, and an American bankruptcy estate will experience the loss. Whether the effect is direct merits further consideration because the demand is made on Bank of California; the letter of credit is a Bank of California obligation. It might be argued that the loss to plaintiff of the Atlantic CD is only indirectly the result of the demand. The case that might seem to support this argument is *Carey v. National Oil Corp.*, 592 F.2d 673, 676–77 (2d

Cir.1979). There, jurisdiction was found lacking under the FSIA in a breach of contract action by a New York corporation against Libya and its oil company. The contract sued upon had been entered into between Libya and a Bahamian subsidiary of plaintiff. The court declined to pierce the parent-subsidiary veil and held that any effect on the parent was indirect. The present case is distinguishable, however, because the effect which prompted the filing of this action—subjection of PFEL's assets to liability on a claim originating with PSO—is the planned-for result of a single integrated transaction. The indemnity relationship from PFEL to Bank of California to Bank Melli to PSO was ancillary to a single contract between PSO and PFEL. Therefore, the effect of the demand on plaintiff is direct.

■ Defendants' main argument against jurisdiction under the "direct effect" clause is that mere financial loss to an American plaintiff is not a sufficient effect on which to premise jurisdiction. They rely principally on *Thos. P. Gonzalez Corp. v. Consejo Nacional de Produccion de Costa Rica*, 614 F.2d 1247 (9th Cir.1980) (*"Gonzalez"*). In testing the propriety of personal jurisdiction under due process standards, the *Gonzalez* court stated that neither plaintiff's California residence nor the fact that an act outside California imposes an economic burden on a California resident is a sufficient basis for personal jurisdiction. *Id.* at 1253. This position does not conflict with *Texas Trading,* however. *Texas Trading* separated its discussion of statutory and constitutional bases of jurisdiction. *Texas Trading* does not hold that financial loss to a U.S. corporation would satisfy, without more, the constitutional requirement of minimum contacts, but only that it may satisfy the statutory requirement of a "direct effect." Since the *Gonzalez* court equated the statutory "direct effect" and constitutional minimum contacts standards and had already found financial loss to be constitutionally insufficient to sustain jurisdiction, it followed that financial loss was also not

a sufficiently "direct effect" under the statute. Employing the *Texas Trading* two-stage analysis, however, *see* note 3, *supra,* the court concludes that statutory "direct effect" jurisdiction exists as to both Bank Melli and PSO, since both took actions that created the relevant effect.[5]

A case has not been made, however, for "piercing the veil" to attribute the acts of Bank Melli and PSO to Iran itself. The Second Circuit, which has issued the leading opinion finding that a foreign government-owned corporation can be treated as an alter ego of the government, *Banco Nacional de Cuba v. First National City Bank*, 478 F.2d 191, 193–94 (1973), has recently clarified the appropriate circumstances for such veil-piercing in *Banco Para El Comercio Exterior de Cuba v. First National City Bank*, 658 F.2d 913, 918–19 (2d Cir.1981), *cert. granted,* —— U.S. ——, 103 S.Ct. 253, 74 L.Ed.2d 198 (1982). Normally, the juridical distinction between a state and its instrumentalities should be respected, unless a counterclaim (or perhaps an original claim, though this is not stated in the opinion) assertable against the state is for state conduct in which the instrumentality had a key role. The court also noted that this rule, which predates the FSIA, was in no way altered by it. The legislative history of the Act is "rich in disclaimers of any intention to cause the courts willy-nilly to pierce the corporate veils of foreign entities such as trading corporations." *Id.*

The court concludes that statutory jurisdiction exists as to Bank Melli by virtue of the Treaty of Amity and both the "act" and "direct effect" clauses of section 1605(a)(2); it exists as to PSO under the "direct effect" clause only. Jurisdiction is lacking over the Islamic Republic of Iran.

2. *Minimum contacts—the due process issue.*

The due process clause has been applied to determine the propriety of exercising jurisdiction over foreign defendants in both *Texas Trading* and *Gonzalez,* as well as in other cases. The basic standard is "minimum contacts" with the forum such that the exercise of defendant does not offend "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

The Ninth Circuit recognizes that if a defendant engages in "substantial" or "continuous and systematic" activities within the forum, general jurisdiction can be exercised over that defendant. *Data Disc, Inc. v. Systems Technology Associates, Inc.*, 557 F.2d 1280 (1977) (*"Data Disc"*). Bank Melli maintains an agency in San Francisco, as well as one in New York, so that general jurisdiction may well be appropriate as to it.[6] Although the parties

---

**5.** Jurisdiction under § 1605(a)(2) might also be based upon an act performed in the United States. The relevant act here would be the demand upon Bank of California for payment. Since the demand was telexed from Iran, this raises the issue of where the act should be considered to have occurred—the place where it was sent or the place where it was received. In *Texas Trading,* the court acknowledged the possibility of finding in modern transcontinental communications "acts" or "activities" in the United States sufficient for jurisdiction under 1605(a)(2), but did not need to resolve the issue, having found jurisdiction under the "direct effect" clause. 647 F.2d at 311 n. 30. The demand here was more than simply a communication; it was a verbal act of legal effect. It triggered Bank of California's obligation to pay. Cases under the antifraud provisions of the securities and commodities trading statutes have treated mailings and other forms of communications into a district which are integral to the alleged fraud as acts which will sustain jurisdiction and venue there. *See Commodity Futures Trading Comm'n v. Savage,* 611 F.2d 270, 278 (9th Cir.1979).

Thus, Bank Melli's demand, communicated to Bank of California in this district, is an additional statutory ground of jurisdiction as to Bank Melli. Whether the demand established jurisdiction over PSO or Iran is more doubtful. PSO's demand on Bank Melli's guarantee was clearly made in Iran. Unless an agency or co-conspirator relationship were established, Bank Melli's demand could not be attributed to PSO, and there is no real evidence of such a relationship. Moreover, as stated in the text, plaintiff has not made a sufficient showing to justify piercing the corporate veil of Bank Melli to reach the government of Iran.

**6.** The New York agency would be relevant if, as *Texas Trading* determined, it's contacts any-

have not briefed the standard for "continuous and systematic activity," and although the record does not contain much evidence on Bank Melli's San Francisco activities, the court is inclined toward the view that Bank Melli is "present" here by virtue of its ongoing activities carried on from its permanent facility within the forum. Since jurisdiction is available over Bank Melli on the basis of contacts related to the letter of credit transaction, however, it is unnecessary to resolve the issue of general jurisdiction.

*Data Disc* is the leading case in the Ninth Circuit, and requires jurisdiction to be evaluated under a three part test:

(1) The nonresident defendant must do some act or consummate some transaction with the forum or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws. (2) The claim must be one which arises out of or results from the defendant's forum-related activities. (3) Exercise of jurisdiction must be reasonable.

557 F.2d at 1287 (citations omitted).

The first and second *Data Disc* conditions are met here by the letter of credit transaction itself. Both PSO and Bank Melli relied on the credit of a California bank in going forward with the cargo shipping and related indemnity agreements. Implicitly, they relied on their ability to enforce the obligation of Bank of California in a California court, as the following hypothetical illustrates: Suppose PSO had made legitimate claims and Bank Melli had paid under its guarantee and sought to collect under the letter of credit, but PFEL

had induced Bank of California not to pay by false representations that PSO's claims were fraudulent. Bank of California and PFEL would have been subject to suit here. Indeed, defendants argue for another purpose—limiting the relief available—that California law governs this letter of credit transaction.

■ Purposeful availment of the benefit of California law is clearer with respect to Bank Melli than to PSO. PSO asked for a guarantee from Bank Melli. Perhaps PFEL could have provided such a guarantee and consummated its agreement with PSO by depositing collateral directly with Bank Melli and not involving Bank of California at all. Thus, it is not completely clear, absent a finding of an agency or conspiracy relationship between Bank Melli and PSO, that there is evidence to satisfy the *Data Disc* conditions as to PSO. The lack of such evidence may be presumed to result at least in part from PSO's refusal of discovery, and, therefore, the preclusion order may obviate it. *See post* at 1161.

Under *Data Disc*, even though the defendant has consummated a transaction with the forum, and the claim arises out of that forum-related activity, the reasonableness of exercising jurisdiction must be assessed with respect to the particular facts of the case. "Reasonableness" is integrally related to the *International Shoe* minimum contacts analysis as further developed in *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). The Ninth Circuit has listed seven factors relevant to the reasonableness of exercising jurisdiction:

where in the United States that go to determine whether minimum contacts exist in a case where service of process is made under § 1608 of the FSIA. 647 F.2d at 314 (comparing service of process provision under FSIA to those under antitrust laws and securities laws). On the other hand, when confronted by the same question, a colleague on our court noted that the Ninth Circuit in *Kramer Motors, Inc. v. British Leyland, Ltd.*, 628 F.2d 1175, 1177 n. 4, *cert. denied*, 449 U.S. 1062, 101 S.Ct. 785, 66 L.Ed.2d 604 (1980), had expressly reserved the question of

whether aggregation of national contacts is proper where jurisdiction is asserted under a statute authorizing nationwide or worldwide service of process. *Meadows v. Dominican Repub.*, 542 F.Supp. 33, 34 (N.D.Cal.1982). In the absence of Ninth Circuit authority, the court applied the traditional minimum contacts analysis confined to contacts with California. Since we do not rely on general jurisdiction over Bank Melli, it is unnecessary for us to determine whether Bank Melli's New York contacts should be given jurisdictional effect in this case.

(A) The extent of the purposeful interjection into the forum state.

(B) The burden on the defendant of defending in the forum.

(C) The extent of conflict with the sovereignty of defendant's state.

(D) The forum state's interest in adjudicating the dispute.

(E) The most efficient judicial resolution of the controversy.

(F) The importance of the forum to the plaintiff's interest in convenient and effective relief.

(G) The existence of an alternative forum.

*Insurance Co. of North America v. Marina Salina Cruz*, 649 F.2d 1266, 1270 (9th Cir.1981) (*"INA"*) (citations omitted).

*Data Disc, World-Wide Volkswagen,* and *INA* all make a distinction between an allegedly negligent act outside the forum having foreseeable results within it and a "purposeful interjection" by the defendant into the forum. By accepting that one of the pillars of the indemnity arrangement was to be anchored in California, Bank Melli may be said to have purposefully interjected itself. As to the second factor, defendants obviously come under a burden in defending the action here, but at least Bank Melli is a voluntary participant in a business transaction, receiving financial benefit therefrom, in the form of fees transmitted from Bank of California. *See Plant Food Co-op v. Wolfkill Feed & Fertilizer Corp.*, 633 F.2d 155, 159 (9th Cir. 1980).

The affront to sovereignty factor mentioned in *INA* is now effectively subsumed under the Congressional policy expressed in the FSIA. If jurisdiction over a nonresident defendant would be otherwise reasonable, the fact that the defendant is an instrumentality of a foreign state engaged in a commercial activity should be presumed not to affront the state's sovereignty. As the courts have noted time and again, in passing the FSIA Congress codified the "restrictive view" of sovereign immunity. Congress intended to assure juris-

diction over commercial claims. *See NYU Note* at 476–81.

The other factors mentioned in *INA* all strongly favor the exercise of jurisdiction by this court. It cannot be seriously maintained that American companies have an alternative forum available to them in Iran, because of the intense anti-Americanism there. This is a fact of which it is appropriate to take judicial notice. At the same time, the forum has a strong interest in adjudicating the dispute, so as to provide a remedy for its citizens who may be defrauded in the course of international business dealings. *See McGee v. International Life Ins. Co.*, 355 U.S. 220, 223, 78 S.Ct. 199, 201, 2 L.Ed.2d 223 (1957) (interest of forum in providing relief for its citizens in action against out-of-state insurer). Since Iran is not an alternative forum, no efficiency comparison can usefully be made. Finally, of course, the plaintiff's need for convenient and effective relief unquestionably favors jurisdiction here.

On the basis of the foregoing analysis, with emphasis on Bank Melli's purposeful interjection by virtue of the letter of credit transaction, the court concludes that personal jurisdiction is proper as to Bank Melli. Since a factual basis is lacking to attribute the same grounds for jurisdiction to PSO on an agency theory, jurisdiction over PSO will be predicated on the preclusion order. The Supreme Court recently upheld reliance on a rule 37 sanctions order to establish personal jurisdiction where the discovery that was refused related to issues that would have established jurisdiction if proven. *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982). Here the discovery sought would have enabled a factual determination to be made regarding plaintiff's alter ego, conspiracy, and agency theories, any of which, if proven, would make jurisdiction proper as to PSO.

*B. Letter of Credit Law Issues*

Letter of credit law is built on the principle of the independence of the letter of

**1162**

credit arrangement from the underlying contract which it guarantees. The cases and the literature frequently state this principle in axiomatic form: Banks deal in documents, not in goods. A bank that issues a letter of credit need not look behind the face of the documents presented for payment. The letter of credit itself spells out what documents must be presented to obtain payment. When those documents are presented and appear regular on their face, the obligation of the bank becomes unconditional.

An important exception to the independence principle has developed under the "fraud in the transaction" doctrine, which originated in the case of *Sztejn v. J. Henry Schroder Banking Corp.*, 177 Misc. 719, 31 N.Y.S.2d 631 (Sup.Ct.1941). When article 5 of the Uniform Commercial Code codified letter of credit law, the independence principle and the exception to it first recognized in *Sztejn* were spelled out in section 5–114:

(1) An issuer must honor a draft or demand for payment which complies with the terms of the relevant credit regardless of whether the goods or documents conform to the underlying contract for sale or other contract between the customer and the beneficiary.

. . . . .

(2) Unless otherwise agreed when documents appear on their face to comply with the terms of credit but a required document is forged or fraudulent or there is fraud in the transaction

(a) the issuer must honor the draft or demand for payment if honor is demanded by ... a holder in due course ...; and

(b) in all other cases as against its customer, an issuer acting in good faith may honor the draft or demand for payment despite notification from the customer of fraud, forgery or other defect not apparent on the face of the documents but a court of appropriate jurisdiction may enjoin such honor.

U.C.C. § 5–114.

Courts have taken differing approaches to defining the standard for fraud that would allow a bank to dishonor a demand for payment or a court to enjoin its honor. A very broad standard was set forth in *Dynamics Corp. of America v. Citizens & Southern National Bank*, 356 F.Supp. 991 (N.D.Ga.1973):

Fraud has a broader meaning in equity [than at law] and intention to defraud or to misrepresent is not a necessary element.

Fraud, indeed, in the sense of a court of equity properly includes all acts, omissions and concealments which involve a breach of legal or equitable duty, trust, or confidence, justly reposed, and are injurious to another, or by which an undue and unconscientious advantage is taken of another.

*Id.* at 998–999 (quoting *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 193–94, 84 S.Ct. 275, 283–84, 11 L.Ed.2d 237 (1963).

The broad view is subject to criticism for allowing a court to provide injunctive relief in a case of mere defective performance. For the most part, courts have been conscious of this danger, and have refused to enjoin payment absent "a clear showing of active intentional fraud," or "evil intent," as opposed to a dispute over performance of a contract. *See KMW International v. Chase Manhattan Bank*, 606 F.2d 10, 16 (2d Cir.1979); *Cappaert Enterprises v. Citizens & S. Int'l Bank*, 486 F.Supp. 819, 826–27 (E.D.La.1980); *American Bell Int'l, Inc. v. Islamic Republic of Iran*, 474 F.Supp. 420, 424–25 (S.D.N.Y.1979); *United Technologies Corp. v. Citibank, N.A.*, 469 F.Supp. 473, 478–79 (S.D.N.Y.1979).

The instant case is quite distinct from those involving no more than a dispute as to performance. A demand for payment under a guarantee against loss, even if only a "simple demand" is required, contains an implied representation that some legitimate, good faith claim underlies such a demand. This is inherent in the notion that all contracts contain an implied covenant of good faith and fair dealing. *See Harm v. Frasher*, 181 Cal.App.2d 405,

5 Cal.Rptr. 367 (1960). Absent such a good faith claim, the demand is an intentional misrepresentation. On such facts as appear here, the "evil intent" could hardly be clearer. *See Itek Corp. v. First National Bank of Boston*, 511 F.Supp. 1341, 1350 (D.Mass.1981).

 Another point of some difficulty in the elaboration of "fraud in the transaction" has been whether "transaction" refers only to the letter of credit transaction itself or embraces as well the underlying contract in goods or services. Without entering into the details of the controversy, *see Note, Letters of Credit: Injunction as a Remedy for Fraud in U.C.C. Section 5–114*, 63 Minn.L.Rev. 487, 501–08 (1979), it seems to us that given a statute that expressly refers to instances where *documents* are "forged or fraudulent," and then, as an alternative test, "or there is fraud in the transaction," the latter category must be large enough to encompass a case such as this where the letter of credit itself is an integral part of PSO's scheme for obtaining funds from PFEL through assertion of non-existent claims.

Although the facts show PSO's active, intentional fraud, under certain circumstances no relief would be available as against Bank Melli, and in fact, Bank Melli could compel payment under the letter of credit. In the usual letter of credit case, the alleged fraud is by the letter of credit beneficiary. Here Bank Melli is the letter of credit beneficiary, and the court has found an insufficient factual basis for holding BM equally culpable in the fraud.

The courts that have faced this type of fact pattern involving a "correspondent bank" have relied on the language of section 5–114(2)(a): "the issuer *must* honor the draft or demand for payment if honor is demanded by ... a *holder in due course*." (emphasis added). *See Sztejn v. J. Henry Schroder Banking Corp., supra*, 31 N.Y.S.2d at 633; *United Bank Ltd. v. Cambridge Sporting Goods*, 41 N.Y.2d 254, 392 N.Y.S.2d 265, 360 N.E.2d 943 (1976). A "holder in due course" is defined in section 3–302 of the U.C.C. as one who takes an instrument for value, in good faith, and without notice of defenses thereto.

As discussed previously, the facts here appear to establish that Bank Melli knew or had reason to know of the fraud, by virtue of the notice that it received that PFEL had ceased operations in Iran and that no claims had been forthcoming. Moreover, under section 3–307(3), once a defense to an instrument is established— here, the existence of fraud in the transaction, then "a person claiming the rights of a holder in due course has the burden of establishing that he or some person under whom he claims is in all respects a holder in due course." *See United Bank Ltd. v. Cambridge Sporting Goods, supra*, 392 N.Y.S.2d at 271–72, 360 N.E.2d at 949–50. Bank Melli has made no effort to carry this burden, and is therefore precluded from claiming the status of a holder in due course.

### C. Relief

Having established that PSO has committed fraud in the transaction and that Bank Melli cannot claim the rights of a holder in due course, plaintiff is entitled to the relief that is available under applicable law. The defendants have argued that the availability of injunctive relief in this case is limited by the governing law.

#### 1. Choice of law.

In enacting its version of the U.C.C., the California legislature deliberately omitted a key phrase from section 5–114 of the uniform version: "a court of appropriate jurisdiction may enjoin such honor." Defendants argue that the California U.C.C. governs here and prevents plaintiff from obtaining injunctive relief. While arguing that such an outcome is not compelled by California law, plaintiff also argues that other law is controlling—either the Uniform Customs and Practices for Documentary Credits ("UCP") or the uniform version of the U.C.C. which he argues applies here as the substantive rule of decision under the federal common law.

Plaintiff's argument under the UCP is ingenious but unavailing. The letter of credit transaction here was explicitly made subject to the UCP (1974 Revision). The UCP is a publication of the International Chamber of Commerce. As its name implies, it is a compendium of commercial practices. The UCP makes no mention of injunctions against honor of a demand under a letter of credit, but does incorporate the independence principle. *See* UCP, General provisions and definitions c. Plaintiff points out that the "fraud in the transaction" exception arose at common law, before its codification in U.C.C. 5-114(2)(B), and cites decisions such as *Stromberg-Carlson Corp. v. Bank Melli Iran*, 467 F.Supp. 530, 532 n. 5 (S.D.N.Y.1979), for the proposition that "[t]he provisions of the [UCP] are not to the contrary [of decisions allowing injunctions]."

What *Stromberg-Carlson* and the other authorities cited by plaintiff show, however, is that the UCP should not be construed as *preventing* relief under the "fraud in the transaction" doctrine, where applicable law permits it. Even though parties make a letter of credit subject to the UCP, it will generally also be subject to the local U.C.C. *See Intraworld Industries, Inc. v. Girard Trust Bank*, 461 Pa. 343, 336 A.2d 316 (1975); *Banco di Roma v. Fidelity Union Trust Co.*, 464 F.Supp. 817, 820 (D.N.J.1979).

Plaintiff argues that because this court has original jurisdiction under 12 U.S.C. § 632, therefore, the "federal law of commerce" should apply. The cases cited by plaintiff do not make this point, however. Plaintiff relies on *Clearfield Trust Co. v. United States*, 318 U.S. 363, 366-67, 63 S.Ct. 573, 574-75, 87 L.Ed. 838 (1943). That case involved a suit by the United States against a bank to recover a payment made against a government check that was cashed under a forged endorsement. Holding that *Erie v. Tompkins* did not apply, the Court said, "The rights and duties of the United States on commercial paper which it issues are governed by federal rather than local law. When the United States disburses its funds or pays its debts,

it is exercising a constitutional function or power." *Id.* Clearly, no exercise of federal functions nor any federal policy, other than the policy of allowing national banks a federal forum, is implicated here.

 If the policy embodied in 12 U.S.C. § 632 calls for any role for federal common law in this case, it would be the federal choice of law rules, to decide which jurisdiction's substantive law should control. *Corporacion Venezolano de Fomento v. Vintero Sales Corp.*, 629 F.2d 786, 794-95 (2d Cir.1980), *cert. denied*, 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 804 (1981). Assuming that the uniform version of the U.C.C. would represent the federal common law of sales, *United States v. Wegematic Corp.*, 360 F.2d 674, 676 (2d Cir.1966), federal choice of law rules do not require or even suggest the application of the federal common law of commerce in a case such as this. Rather, in an area such as commercial law that is traditionally regulated by the states, the substantive law rule of the jurisdiction with the most significant contact with the transaction should control, *Equitable Trust Co. v. G & M Constr. Corp.*, 544 F.Supp. 736, 741-42 (D.Md. 1982), unless the rule of decision provided by that law would hinder or be hostile to a federal program or interest. *United States v. California*, 655 F.2d 914, 917 (9th Cir.1980). The jurisdiction with the most contacts here is clearly either Iran or California. As defendant states, "Since no one has briefed the law of Iran, the only other choice available to the court is the law of California."

*2. Availability of injunctive relief under California U.C.C.*

 The California legislature omitted the U.C.C. language that permits a court to enjoin honor of a draft drawn under a letter of credit. This action was a statement of legislative policy that such injunctions "do violence" to the independence principle. *See* Cal.Com.Code § 5114 (West), comment 6. In the only cases to come to our attention which have faced the

issue, a colleague on our court has concluded that this deliberate legislative omission has the effect of prohibiting courts applying California law from issuing an injunction against honor. *Watkins-Johnson Co. v. Wells Fargo Bank*, C–79–0121 SAW, slip op. at 6 (N.D.Cal. Feb. 27, 1979); *Agnew v. FDIC*, 548 F.Supp. 1234 at 1238 (N.D.Cal. Oct. 15, 1982).

The legislature did not make such a prohibition explicit, however, and in studying the code comment which provides the background to the legislature's action, we have found two factors which are present in the instant case to differentiate it from the type of case upon which the legislature focused its attention. First, the legislature apparently believed that the beneficiary of the letter of credit—in the case focused on, a foreign seller of goods to a California buyer—would normally not be present in the jurisdiction nor amenable to service of process. Thus, the issuing bank's honor of the draft would be enjoined on the basis of the buyer's representations alone, with no one before the court to represent the seller's interest. Alternatively, the seller would be forced to come to the buyer's country to litigate. Here, the beneficiary, Bank Melli, is *present* in the jurisdiction and is amenable to service of process apart from the letter of credit transaction sued upon.

Second, as between placing on the seller the burden of coming to the buyer's country to litigate and forcing the buyer to pursue the seller in the courts of the seller's country, the legislature preferred the latter as more consistent with the parties' bargained-for risk allocation. A basic legislative assumption, however, was that the courts of the seller's country would provide an alternative forum for resolution of the dispute. There is no indication that the legislature intended to prevent the California buyer from obtaining relief in an American court if the courts of the seller's country were effectively closed to him, as would be the case here.

Even if California law were interpreted as prohibiting an injunction against Bank of California's honor of Bank Melli's demand, it would not prohibit us, where the court has jurisdiction over the demanding party, from issuing a mandatory injunction requiring withdrawal of the demand and prohibiting any future demand. *See Steinmeyer v. Warner Consolidated Corp.*, 42 Cal.App.3d 515, 116 Cal.Rptr. 57 (1974).

*3. Appropriateness of injunctive relief.*

Plaintiff does not have an adequate remedy at law. Should an injunction not issue and should the Bank of California elect to pay out on the letter of credit, plaintiff has no effective recourse in the courts of Iran. If a money judgment for fraud or conversion were entered against PSO, it has no assets in the United States against which to enforce the judgment. Since fraud has not been proven against Bank Melli, no damage judgment could be entered against it if it received the funds from Bank of California.

The equities also strongly favor plaintiff. Plaintiff is a fiduciary for the benefit of the unsecured creditors and, ultimately, the shareholders of PFEL. Issuing the injunction will cause no hardship whatsoever to defendants. Plaintiff has offered repeatedly throughout this litigation to indemnify any actual, bona fide claims for losses within the scope of the indemnity arrangement. The final judgment and order will incorporate such a provision for saving any actual claims. True, defendants will have lost what their pre-revolutionary predecessors bargained for—freedom from having to prove claims—but that is the price they must pay for PSO's greed and Bank Melli's failure to act as a responsible and prudent bank.

*4. Relief granted.*

The court hereby declares that the indemnity arrangement entered into between and among plaintiff and defendants, Bank of California, Bank Melli, and PSO was limited in its intended scope to the payment of claims for lost or damaged cargo. All such bona fide claims heretofore presented having been satisfied, upon the presentation with documentary proof of any out-

standing claims as more particularly set forth below and the satisfaction thereof by defendant Bank of California, the court further declares that the indemnity arrangement will be terminated and plaintiff will be entitled to the return of such portion of the funds represented by the Atlantic CD as remain after reimbursement of Bank of California for payments made pursuant to the claims procedure set forth herein. At the termination of the indemnity arrangement, none of the parties herein will have any further right to look to any other party for satisfaction of any claims nor to make any demands upon any other party nor to seek in any forum to revive or enforce any of the rights previously existent under the arrangement and now terminated by this declaration of rights.

Defendant Bank of California is hereby permanently enjoined from honoring any demand for payment that has previously been made or that may hereafter be made under letter of credit 55851, except as follows:

1) Within 60 days from the entry of final judgment hereunder, Bank Melli may file and serve upon Bank of California and plaintiff claims and documentary proof thereof covering any claims presented to it by PSO which are within the scope of the indemnity arrangement as determined herein and which have not previously been satisfied by Bank of California under the indemnity arrangement.

2) Plaintiff shall have 20 days from the date of service upon him to file and serve upon Bank of California and Bank Melli any objections to payment of such claims. Any claims to which plaintiff does not object as specified above shall be paid forthwith by Bank of California.

3) Any claims to which there is objection shall be settled through binding arbitration before an arbitrator mutually agreed upon. If the parties cannot agree upon an arbitrator, either party may petition this court to appoint an arbitrator. The prevailing party in such arbitration proceedings shall be entitled to his costs, including a reasonable attorney's fee from the non-prevailing party.

The foregoing provisions of this decision are entered pursuant to the court's inherent power to condition the granting of equitable relief upon such provisions as are necessary to do justice in the particular case. *See Hecht v. Bowles*, 321 U.S. 321, 329–30, 64 S.Ct. 587, 591–92, 88 L.Ed. 754 (1944).

Defendant Bank Melli is ordered to withdraw the demand previously made for payment under letter of credit 55851 and is permanently enjoined from making any further demand for payment under letter of credit 55851 except as provided above.

All remedial provisions of this decision are effective immediately upon the entry of final judgment herein.

SO ORDERED.